Justice Stevens,
with whom Justice Ginsburg and Justice Breyer join as to Parts II-V, dissenting.
As I have explained on prior occasions, I am convinced that the Court’s aggressive supervision of state action designed to accommodate the political concerns of historically disadvantaged minority groups is seriously misguided. A majority’s attempt to enable the minority to participate more effectively in the process of democratic government should not be viewed with the same hostility that is appropriate for oppressive and exclusionary abuses of political power. See, e. g., Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 243-249 (1995) (Stevens, J., dissenting); Miller v. Johnson, 515 U. S. 900, 931-933 (1995) (Stevens, J., dissenting); Shaw v. Reno, 509 U. S. 630, 634-635 (1993) (Shaw I) (Stevens, J., dissenting); Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 316-317 (1986) (Stevens, J., dissenting); Cousins v. City Council *919 of Chicago, 466 F. 2d 830, 852 (CA7 1972) (Stevens, J., dissenting). But even if we accept the Court’s refusal to recognize any distinction between two vastly different kinds of situations, we should affirm the judgment of the District Court in this case.
As the Court analyzes the case, it raises three distinct questions: (1) Should North Carolina’s decision to create two congressional districts in which a majority of the voters are African-American be subject to strict constitutional scrutiny?; (2) If so, did North Carolina have a compelling interest in creating such districts?; and (3) If so, was the creation of those districts “narrowly tailored” to further the asserted compelling interest? The Court inadequately explains its answer to the first question, and it avoids answering the second because it concludes that its answer to the third disposes of the case. In my estimation, the Court’s disposition of all three questions is most unsatisfactory.
After commenting on the majority’s treatment of the threshold jurisdictional issue, I shall discuss separately the three questions outlined above. In doing so, I do not mean to imply that I endorse the majority’s effort to apply in rigid fashion the strict scrutiny analysis developed for cases of a far different type. I mean only to show that, even on its own terms, the majority’s analysis fails to convince.
I
I have explained previously why I believe that the Court has failed to supply a coherent theory of standing to justify its emerging and misguided race-based districting jurisprudence. See Miller v. Johnson, 515 U. S., at 929-931 (Stevens, J., dissenting); United States v. Hays, 515 U. S. 737, 750-751 (1995) (Stevens, J., concurring in judgment). The Court’s analysis of the standing question in this case is similarly unsatisfactory, and, in my view, reflects the fact that the so-called Shaw claim seeks to employ the federal courts to impose a particular form of electoral process, *920 rather than to redress any racially discriminatory treatment that the electoral process has imposed. In this instance, therefore, I shall consider the standing question in light of the majority’s assertions about the nature of the underlying constitutional challenge.
I begin by noting that this case reveals the Shaw claim to be useful less as a tool for protecting against racial discrimination than as a means by which state residents may second-guess legislative districting in federal court for partisan ends. The plaintiff-intervenors in this case are Republicans. It is apparent from the record that their real grievance is that they are represented in Congress by Democrats when they would prefer to be represented by members of their own party. They do not suggest that the racial identity of their representatives is a matter of concern, but it is obvious that their political identity is critical. See Pope v. Blue, 809 F. Supp. 392 (WDNC 1992).
Significantly, from the outset of the legislative deliberations, the Republican Party did not oppose the creation of more than one majority-minority district. Indeed, several plans proposed by the Republicans in the state legislature provided two such districts. 861 F. Supp. 408, 460 (EDNC 1994). However, now that.the State has created a district that is designed to preserve Democratic incumbents, and now that the plaintiff-intervenors’ partisan gerrymandering suit has been dismissed for failure to state a claim, these intervenors have joined this racial gerrymandering challenge.
It is plain that these intervenors are using their allegations of impermissibly race-based districting to achieve the same substantive result that their previous, less emotionally charged partisan gerrymandering challenge failed to secure. In light of the amorphous nature of the race discrimination claim recognized in Shaw I, it is inevitable that allegations of racial gerrymandering will become a standard means by which unsuccessful majority-race candidates, and their par *921 ties, will seek to obtain judicially what they could not obtain electorally.
Even if the other plaintiffs to this litigation do object to the use of race in the districting process for reasons other than partisan political advantage, the majority fails to explain adequately the nature of their constitutional challenge, or why it should be cognizable under the Equal Protection Clause. Not surprisingly, therefore, the majority’s explanation of why these plaintiffs have standing to bring this challenge is unconvincing.
It is important to point out what these plaintiffs do not claim. Counsel for appellees put the matter succinctly when he stated that this case is not Gomillion v. Lightfoot, 364 U. S. 339 (1960).[1] There, the plaintiffs had been prohibited from voting in municipal elections; here, all voters remain free to select representatives to Congress. Thus, while the plaintiffs purport to be challenging an unconstitutional racial gerrymander, they do not claim that they have been shut out of the electoral process on account of race, or that their voting power has been diluted as a consequence of race-based districting. Shaw I, 509 U. S., at 641.
What then is the wrong that these plaintiffs have suffered that entitles them to call upon a federal court for redress? In Shaw I, the majority construed the plaintiffs’ claim to be that the Equal Protection Clause forbids race-based dis-tricting designed solely to “separate” voters by race, and that North Carolina’s districting process violated the prohibition. Ibid. Even if that were the claim before us, these plaintiffs should not have standing to bring it. The record shows that North Carolina’s districting plan served to require these plaintiffs to share a district with voters of a different race. Thus, the injury that these plaintiffs have suffered, to the extent that there has been injury at all, stems *922 from the integrative rather than the segregative effects of the State’s redistricting plan.
Perhaps cognizant of this incongruity, counsel for plaintiffs asserted a rather more abstract objection to race-based dis-tricting at oral argument. He suggested that the plaintiffs objected to the use of race in the districting process not because of any adverse consequence that these plaintiffs, on account of their race, had suffered more than other persons, but rather because the State’s failure to obey a constitutional command to legislate in a color-blind manner conveyed a message to voters across the State that “there are two black districts and ten white districts.”[2] Tr. of Oral Arg. 5.
Such a challenge calls to mind Justice Frankfurter’s memorable characterization of the suit brought in Colegrove v. Green, 328 U. S. 549, 552 (1946). “This is not an action to recover for damage because of the discriminatory exclusion of a plaintiff from rights enjoyed by other citizens,” he explained. “The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity.” Ibid. Suits of this type necessarily press the boundaries of federal-court jurisdiction, if they do not surpass it. When a federal court is called upon, as it is here, to parse among varying legislative choices about the political structure of a State, and when the litigant’s claim ultimately rests on “a difference of opinion as to the function of representative government” rather than a claim of discriminatory exclusion, Baker v. Carr, 369 U. S. 186, 333 (1962) (Harlan, J., dissenting), there is reason for *923 pause. Cf. Lujan v. Defenders of Wildlife, 504 U. S. 555, 573-574 (1992).[3]
Even if an objection to a State’s decision to forgo colorblind districting is cognizable under some constitutional provision, I do not understand why that provision should be the Equal Protection Clause. In Reynolds v. Sims, 377 U. S. 533, 561 (1964), we were careful to point out that “[a] predominant consideration in determining whether a State’s legislative apportionment scheme constitutes an invidious discrimination violative of rights asserted under the Equal Protection Clause is that the rights allegedly impaired are individual and personal in nature.” In addition, in Palmer v. Thompson, 403 U. S. 217, 225 (1971), we explained that racially motivated legislation violates the Equal Protection Clause only when the challenged legislation “affect[s] blacks differently from whites.”
To be sure, as some commentators have noted, we have permitted generalized claims of harm resulting from state-sponsored messages to secure standing under the Establishment Clause. Pildes & Niemi, Expressive Harms, “Bizarre Districts,” and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno, 92 Mich. L. Rev. 483, 499-524 (1993). It would be quite strange, however, to confer similarly broad standing under the Equal Protection Clause because that Clause protects against wrongs which by definition burden some persons but not others.
Here, of course, it appears that no individual has been burdened more than any other. The supposedly insidious messages that Shaw I contends will follow from extremely irreg *924 ular race-based districting will presumably be received in equal measure by all state residents. For that reason, the claimed violation of a shared right to a color-blind districting process would not seem to implicate the Equal Protection Clause at all precisely because it rests neither on a challenge to the State’s decision to distribute burdens and benefits unequally, nor on a claim that the State’s formally equal treatment of its citizens in fact stamps persons of one race with a badge of inferiority. See Bush v. Vera, post, at 1052-1054 (Souter, J., dissenting).
Indeed, to the extent that any person has been burdened more than any other by the State’s districting plan, geography rather than race would seem to be to blame. The State has not chosen to subject only persons of a particular race to race-based districting. Rather, the State has selected certain geographical regions in which all voters — both white and black — have been assigned to race-based districts. Thus, what distinguishes those residents who have received a “color-blind” districting process from those who have not is geography rather than racial identity. Not surprisingly, therefore, Shaw I emphasizes that the race of the members of the plaintiff class is irrelevant. Shaw I, 509 U. S., at 641.
Given the absence of any showing, or, indeed, any allegation, that any person has been harmed more than any other on account of race, the Court’s decision to entertain the claim of these plaintiffs would seem to emanate less from the Equal Protection Clause’s bar against racial discrimination than from the Court’s unarticulated recognition of a new substantive due process right to “color-blind” districting itself. See id., at 641-642.[4] Revealed for what it is, the constitu *925 tional claim before us ultimately depends for its success on little more than speculative judicial suppositions about the societal message that is to be gleaned from race-based dis-tricting. I know of no workable constitutional principle, however, that can discern whether the message conveyed is a distressing endorsement of racial separatism, or an inspiring call to integrate the political process. As a result, I know of no basis for recognizing the right to color-blind districting that has been asserted here.
Even if there were some merit to the constitutional claim, it is at least clear that it requires the recognition of a new constitutional right. For that very reason, the Court’s suggestion that pre-Shaw, race discrimination precedent somehow compels the application of strict scrutiny is disingenuous. The fact that our equal protection jurisprudence requires strict scrutiny of a claim that the State has used race as a criterion for imposing burdens on some persons but not others does not mean that the Constitution demands that a similar level of review obtain for a claim that the State has used race to impose equal burdens on the polity as a whole, or upon some nonracially defined portion thereof. As to the latter claim, the State may well deserve more deference when it determines that racial considerations are legitimate in a context that results in no race-based, unequal treatment.
To take but one example, I do not believe that it would make sense to apply strict scrutiny to the Federal Government’s decision to require citizens to identify their race on census forms, even though that requirement would force citizens to classify themselves racially, and even though such a requirement would arguably convey an insidious message about the Government’s continuing belief that race remains relevant to the formulation of public policy. Of course, if the Federal Government required only those persons residing in *926 the Midwest to identify their race on the census form, I do not doubt that only persons living in States in that region who filled out the forms would have standing to bring the constitutional challenge. I do doubt, however, whether our equal protection jurisprudence would require a federal court to evaluate the claim itself under strict scrutiny. In such a ease, the only unequal treatment would have resulted from the State’s decision to discriminate on the basis of geography, a race-neutral selection criterion that has not generally been thought to necessitate close judicial review.
The majority ignores these concerns and simply applies the standing test set forth in United States v. Hays, 515 U. S. 737 (1995), on the apparent assumption that this test adequately identifies those who have been personally denied “equal treatment” on account of race. Id., at 745. In Hays, the Court held that a plaintiff has standing to challenge a State’s use of race in districting for Shaw claims if he (1). lives in a district that allegedly constitutes a racial gerrymander or (2) shows that, although he resides outside such a district, he has been personally subject to a racial classification. Ante, at 904. On this basis, the Court concludes that none of the plaintiffs in this action has standing to challenge District 1, but that two of them have standing to challenge District 12. Ibid.
As I understand it, the distinction drawn in Hays between those who live within a district, and those who do not, is thought to be relevant because voters who live in the “gerrymandered” district will have suffered the “personal” injuries inflicted by race-based districting more than other state residents.[5] Those injuries are said to be “representational” harms in the sense that race-based districting may cause officeholders to represent only those of the majority race in *927 their district, or “stigmatic” harms, in the sense that the race-based line-drawing may promote racial hostility. United States v. Hays, 515 U. S., at 744-745; Shaw I, 509 U. S., at 646-649.
Even if I were to accept the flawed assumption that the Hays test serves to identify any voter who has been burdened more than any other as a consequence of his race, I would still find it a most puzzling inquiry. What the Court fails to explain, as it failed to explain in Hays, is why evidence showing either that one lives in an allegedly racially gerrymandered district or that one’s district assignment directly resulted from a racial classification should suffice to distinguish those who have suffered the representational and stigmatic harms that supposedly follow from race-based districting from those who have not.
If representational injuries are what one must show to secure standing under Hays, then a demonstration that a voter’s race led to his assignment to a particular district would perhaps be relevant to the jurisdictional inquiry, but surely not sufficient to satisfy it. There is no necessary correlation between race-based districting assignments and inadequate representation. See Davis v. Bandemer, 478 U. S. 109, 132 (1986) (opinion of White, J.). Indeed, any assumption that such a correlation exists could only be based on a stereotypical assumption about the kind of representation that politicians elected by minority voters are capable of providing. See Miller v. Johnson, 515 U. S., at 930 (Stevens, J., dissenting).
To prove the representational harms that Hays holds are needed to establish standing to assert a Shaw claim, one would think that plaintiffs should be required to put forth evidence that demonstrates that their political representatives are actually unlikely to provide effective representation to those voters whose interests are not aligned with those of the majority race in their district. Here, as the record reveals, no plaintiff has made such a showing. See *928 861 F. Supp., at 424-425, 471, n. 59. Given our general reluctance to hear claims founded on speculative assertions of injury, I do not understand why the majority concludes that the speculative possibility that race-based districting “may” cause these plaintiffs to receive less than complete representation suffices to create a cognizable case or controversy. United States v. Hays, 515 U. S., at 745.
If under Hays the so-called “stigmatic” harms which result from extreme race-based districting suffice to secure standing, then I fail to see why it matters whether the litigants live within the “gerrymandered” district or were placed in a district as a result of their race. As I have pointed out, all voters in North Carolina would seem to be equally affected by the messages of “balkanization” or “racial apartheid” that racially gerrymandered maps supposedly convey, cf. Davis, 478 U. S., at 153 (O’Connor, J., concurring in judgment).
Even if race-based districting could be said to impose more personal harms than the so-called “stigmatic” harms that Hays itself identified, I do not understand why any voter’s reputation or dignity should be presumed to have been harmed simply because he resides in a highly integrated, majority-minority voting district that the legislature has deliberately created. Certainly the background social facts are not such that we should presume that the “stigmatic harm” described in Hays and Shaw I amounts to that found cognizable under the Equal Protection Clause in Brown v. Board of Education, 347 U. S. 483, 495 (1954), where state-sponsored school segregation caused some students, but not others, to be stamped with a badge of inferiority on account of their race. See Shaw I, 509 U. S., at 682, n. 4 (Souter, J., dissenting).
In sum, even if it could be assumed that the plaintiffs in this case asserted the personalized injuries recognized in Hays at the time of Shaw I by virtue of their bare allegations of racial gerrymandering, they have surely failed to prove *929 the existence of such injuries to the degree that we normally require at this stage of the litigation. See Lujan v. Defenders of Wildlife, 504 U. S. 555 (1992). Thus, so long as the Court insists on treating this type of suit as a traditional equal protection claim, it must either mean to take a broader view of the power of federal courts to entertain challenges to race-based governmental action than it has heretofore adopted, see Allen v. Wright, 468 U. S. 787 (1984); cf. Palmer, 403 U. S., at 224-225, or to create a special exception to general jurisdictional limitations for plaintiffs such as those before us here. Suffice it to say, I charitably assume the former to be the case, and proceed to consider the merits on the assumption that Shaw I was correctly decided.
II
The District Court concluded that Shaw I required the application of strict scrutiny in any case containing proof that “racial considerations played a ‘substantial’ or ‘motivating’ role in the line-drawing process, even if they were not the only factor that influenced that process.” 861 F. Supp., at 431. The court acknowledged that under this standard any deliberate effort to draw majority-minority districts in conformity with the Voting Rights Act would attract the strictest constitutional review, regardless of whether race-neutral districting criteria were also considered. Id., at 429. As a consequence, it applied strict scrutiny in this case solely on the basis of North Carolina’s concession that it sought to draw two majority-minority districts in order to comply with the Voting Rights Act, and without performing any inquiry into whether North Carolina had considered race-neutral districting criteria in drawing District 12’s boundaries.
As the majority concludes, the District Court’s test for triggering strict scrutiny set too low a threshold for subjecting a State’s districting effort to rigorous, if not fatal, constitutional review. Ante, at 905. In my view, therefore, the Court should at the very least remand the case to allow *930 the District Court, which possesses an obvious familiarity with the record and a superior understanding of local dynamics,[6] to make the fact-intensive inquiry into legislative purpose that the proper test for triggering strict scrutiny requires. Although I do not share the majority’s willingness to divine on my own the degree to which race determined the precise contours of District 12, if forced to decide the matter on this record, I would reject the majority’s conclusion that a fair application of precedent dictates that North Carolina’s redistricting effort should be subject to strict scrutiny.
Subsequent to the District Court’s decision, we handed down Miller v. Johnson, 515 U. S. 900 (1995), and issued our summary affirmance in DeWitt v. Wilson, 515 U. S. 1170 (1995). As I understand the Miller test, and as it was applied in DeWitt, state legislatures may take racial and ethnic characteristics of voters into account when they are drawing district boundaries without triggering strict scrutiny so long as race is not the “predominant” consideration guiding their deliberations. Miller v. Johnson, 515 U. S., at 916. To show that race has been “predominant,” a plaintiff must show that “the legislature subordinated traditional race-neutral districting principles ... to racial considerations” in drawing that district. Ibid.; see also id., at 928 (O’Connor, J., concurring) (“To invoke strict scrutiny, a plaintiff must show that the State has relied on race in substantial disregard of customary and traditional districting practices”); DeWitt v. Wilson, 856 F. Supp. 1409, 1412 (ED Cal. 1994), aff’d in part, dism’d in part, 515 U. S. 1170 (1995) (declining to apply strict scrutiny because State complied with traditional districting principles).
*931 Indeed, the principal opinion in Bush v. Vera, post, p. 952, issued this same day, makes clear that the deliberate consideration of race in drawing district lines does not in and of itself invite constitutional suspicion. As the opinion there explains, our precedents do not require the application of strict scrutiny “to all cases of intentional creation of majority-minority districts.” Bush, post, at 958. Rather, strict scrutiny should apply only upon a demonstration that “‘race for its own sake, and not other districting principles, was the legislature’s dominant and controlling rationale in drawing its district lines.’” Ibid, (quoting Miller, 515 U. S., at 913).
Because “the legitimate consideration of race in a dis-tricting decision is usually inevitable under the Voting Rights Act when communities are racially mixed,” Shaw I, 509 U. S., at 683 (Souter, J., dissenting), our decisions in Miller, DeWitt, and Bush have quite properly declined to deem all race-based districting subject to strict scrutiny. Unlike many situations in which the consideration of race itself necessarily gives rise to constitutional suspicion, see, e. g., Batson v. Kentucky, 476 U. S. 79 (1986); Adarand Constructors, Inc. v. Peña, 515 U. S. 200 (1995), our precedents have sensibly recognized that in the context of redistricting a plaintiff must demonstrate that race had been used in a particularly determinative manner before strict constitutional scrutiny should obtain. Cf. Regents of Univ. of Cal. v. Bakke, 438 U. S. 265 (1978). This higher threshold for triggering strict scrutiny comports with the fact that the shared representational and stigmatic harms that Shaw purports to guard against are likely to occur only when the State subordinates race-neutral districting principles to a racial goal. See Shaw I, 509 U. S., at 646-649; 861 F. Supp., at 476-478 (Voorhees, C. J., dissenting); Pildes & Niemi, 92 Mich. L. Rev., at 499-524.
Shaw I is entirely consistent with our holdings that race-based districting which respects traditional districting prin *932 ciples does not give rise to constitutional suspicion. As the District Court noted, Shaw I expressly reserved the question whether “‘the intentional creation of majority-minority districts, without more,’ always gives rise to an equal protection claim.” 861 F. Supp., at 429 (quoting Shaw I, 509 U. S., at 649). Shaw I held only that an equal protection claim could lie as a result of allegations suggesting that the State’s districting was “so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles.” Id., at 642 (emphasis added).
Moreover, Miller belies the conclusion that strict scrutiny must apply to all deliberate attempts to draw majority-minority districts if the Equal Protection Clause is to provide any practical limitation on a State’s power to engage in race-based districting. Although Georgia argued that it had complied with traditional districting principles, the Miller majority had little difficulty concluding that the State’s race-neutral explanations were implausible. Miller v. Johnson, 515 U. S. 900 (1995).[7] Thus, Miller demonstrates that although States may avoid strict scrutiny by complying with traditional districting principles, they may not do so by proffering pretextual, race-neutral explanations for their maps.
The notion that conscientious federal judges will be able to distinguish race-neutral explanations from pretextual ones is hardly foreign to our race discrimination jurisprudence. In a variety of contexts, from employment to juror selection, we have required plaintiffs to demonstrate not only that a *933 defendant’s action could be understood as impermissibly race based, but also that the defendant’s assertedly race-neutral explanation for that action was in fact a pretext for racial discrimination. Purkett v. Elem, 514 U. S. 765, 767-768 (1995); St. Mary’s Honor Center v. Hicks, 509 U. S. 502, 518-519 (1993). Similarly, I understand Shaw I, Miller, De-Witt, and Bush to require plaintiffs to prove that the State did not respect traditional districting principles in drawing majority-minority districts. See Bush, post, at 958.
In holding that the present record shows race to have been the “predominant” consideration in the creation of District 12, the Court relies on two pieces of evidence: the State’s admission that its “overriding” purpose was to “ ‘create two congressional districts with effective black voting majorities,’ ” ante, at 906; and the “ ‘geographically non-compact’ ” shape of District 12, ibid. In my view, this evidence does not suffice to trigger strict scrutiny under the “demanding” test that Miller establishes. Miller v. Johnson, 515 U. S., at 928 (O’Connor, J., concurring).[8]
North Carolina’s admission reveals that it intended to create a second majority-minority district.[9] That says noth *934 ing about whether it subordinated traditional districting principles in drawing District 12. States that conclude that federal law requires majority-minority districts have little choice but to give “overriding” weight to that concern. Indeed, in Voinovich v. Quilter, 507 U. S. 146, 159 (1993), we explained that evidence that showed that Ohio’s chief mapmaker preferred “federal over state law when he believed the two in conflict does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution.” For that reason, we have not previously held that concessions such as North Carolina’s suffice to trigger strict scrutiny. Cf. Bush, post, at 958, 962.[10] Thus, the State’s concession is of little significance.
District 12’s noncompact appearance also fails to show that North Carolina engaged in suspect race-based districting. There is no federal statutory or constitutional requirement that state electoral boundaries conform to any particular ideal of geographic compactness. In addition, although the North Carolina Constitution requires electoral districts for state elective office to be contiguous, it does not require them to be geographically compact.[11] N. C. Const., Art. II, *935 §§ 2, 5 (1984). Given that numerous States have written geographical compactness requirements into their State Constitutions, North Carolina’s omission on this score is noteworthy. See Grofman, Criteria for Districting: A Social Science Perspective, 83 UCLA L. Rev. 77, 84 (1985). It reveals that North Carolina’s creation of a geographically noncompact district does not itself mark a deviation from any prevailing state districting principle.[12] Thus, while the serpentine character of District 12 may give rise to an inference that traditional districting principles were subordinated to race in determining its boundaries, it cannot fairly be said to prove that conclusion in light of the clear evidence demonstrating race-neutral explanations for the district’s tortured shape. See infra, at 936-937.
There is a more fundamental flaw in the majority’s conclusion that racial concerns predominantly explain the creation of District 12. The evidence of shape and intent relied on by the majority cannot overcome the basic fact that North Carolina did not have to draw Districts 1 and 12 in order to comply with the Justice Department’s finding that federal law required the creation of two majority-minority districts. That goal could have been more straightfor *936 wardly accomplished by simply adopting the Attorney General’s recommendation to draw a geographically compact district in the southeastern portion of the State in addition to the majority-minority district that had already been drawn in the northeastern and Piedmont regions. See Shaw I, 509 U. S., at 634-685; 861 F. Supp., at 460, 461-462, 464.
That the legislature chose to draw Districts 1 and 12 instead surely suggests that something more than the desire to create a majority-minority district took precedence. For that reason, this case would seem to present a version of the very hypothetical that the principal opinion in Bush suggests should pose no constitutional problem — “an otherwise compact majority-minority district that is misshapen by predominantly nonracial, political manipulation.” Bush, post, at 981.
Here, no evidence suggests that race played any role in the legislature’s decision to choose the winding contours of District 12 over the more cartographically pleasant boundaries proposed by the Attorney General.[13] Rather, the rec *937 ord reveals that two race-neutral, traditional districting criteria determined District 12’s shape: the interest in ensuring that incumbents would remain residents of the districts they have previously represented; and the interest in placing predominantly rural voters in one district and predominantly urban voters in another. 861 F. Supp., at 466-472; see also Miller v. Johnson, 515 U. S. 900 (1995) (considering whether communities of interest were preserved); White v. Weiser, 412 U. S. 783, 793-797 (1973) (establishing incumbency protection as a legitimate districting principle).
Unlike most States, North Carolina has not given its chief executive any power to veto enactments of its legislature. Thus, even though the voters had elected a Republican Governor, the Democratic majority in the legislature was in control of the districting process. It was the Democrats who first decided to adopt the 11-white-district plan that arguably would have violated §2 of the Voting Rights Act and gave rise to the Attorney General’s objection under §5. It was also the Democrats who rejected Republican Party maps that contained two majority-minority districts because they created too many districts in which a majority of the residents were registered Republicans. 861 F. Supp., at 460.
If race rather than incumbency protection had been the dominant consideration, it seems highly unlikely that the Democrats would have drawn this bizarre district rather than accepting more compact options that were clearly available. If race, rather than politics, had been the “predominant” consideration for the Democrats, they could have accepted the Republican Plan, thereby satisfying the Attorney General and avoiding any significant risk of liability as well as the attack mounted by the plaintiffs in this case. Instead, as the detailed findings of the District Court demonstrate, the legislature deliberately crafted a districting plan that *938 would accommodate the needs of Democratic incumbents. Id., at 466-467.[14]
If the Democrats remain in control of the districting process after the remand in this case, it will be interesting to see whether they will be willing to sacrifice one or more Democratic-majority districts in order to create at least two districts with effective minority voting majorities. My review of the history revealed in the findings of the District Court persuades me that political considerations will probably take priority over racial considerations in the immediate future, just as they surely did during the process of rejecting the Republican Plan and ultimately adopting the plan challenged in this case.[15]
A deliberate effort to consolidate urban voters in one district and rural voters in another also explains District 12’s highly irregular shape. Before District 12 had been drawn, members of the public as well as legislators had urged that “the observance of distinctive urban and rural communities of interest should be a prime consideration in the general redistricting process.” Id., at 466. As a result, the legislature was naturally attracted to a plan that, although less than esthetically pleasing, included both District 12, which links the State’s major urban centers, and District 1, which has a population that predominantly lives in cities with populations of less than 20,000. Id., at 467.
*939 Moreover, the record reveals that District 12’s lines were drawn in order to unite an African-American community whose political tradition was quite distinct from the one that defines African-American voters in the Coastal Plain, which District 1 surrounds. Ibid. Indeed, two other majority-minority-district plans with less torturous boundaries were thought unsatisfactory precisely because they did not unite communities of interest. 861 F. Supp., at 465-466; Tr. 481. Significantly, the irregular contours of District 12 track the State’s main interstate highway and are located entirely within the culturally distinct Piedmont Crescent region. 861 F. Supp., at 466. Clearly, then, District 12 was drawn around a community “defined by actual shared interests” rather than racial demography. Miller v. Johnson, 515 U. S., at 916; see also Shaw I, 509 U. S., at 647-648; DeWitt v. Wilson, 856 F. Supp., at 1412, 1413-1414 (recognizing that districts were “functionally” compact because they surrounded “communit[ies] of interest”).
In light of the majority’s decision not to remand for proper application of the Miller test, I do not understand how it can condemn the drawing of District 12 given these two race-neutral justifications for its shape. To be sure, in choosing a district that snakes rather than sits, North Carolina did not put a premium on geographical compactness. But I do not understand why that should matter in light of the evidence that shows that other race-neutral districting considerations were determinative.[16]
*940 III
As the foregoing discussion illustrates, legislative decisions are often the product of compromise and mixed motives. For that reason, I have always been skeptical about the value of motivational analysis as a basis for constitutional adjudication. See, e. g., Washington v. Davis, 426 U. S. 229, 253-254 (1976) (Stevens, J., concurring). I am particularly skeptical of such an inquiry in a case of this type, as mixed motivations would seem to be endemic to the endeavor of political districting. See, e. g, Bush, post, at 959 (“The present suit is a mixed motive case”).
The majority’s analysis of the “compelling interest” issue nicely demonstrates the problem with parsing legislative motive in this context. The majority posits that the legislature’s compelling interest in drawing District 12 was its desire to avoid liability under § 2 of the Voting Rights Act. Yet it addresses the question whether North Carolina had a compelling interest only because it first concludes that a racial purpose dominated the State’s districting effort.
It seems to me that if the State’s true purpose were to serve its compelling interest in staving off costly litigation by complying with federal law, then it cannot be correct to say that a racially discriminatory purpose controlled its line-drawing. A more accurate conclusion would be that the State took race into account only to the extent necessary to meet the requirements of a carefully thought out federal statute. See Voinovich v. Quilter, 507 U. S., at 159. The majority’s implicit equation of the intentional consideration *941 of race in order to comply with the Voting Rights Act with intentional racial discrimination reveals the inadequacy of the framework it adopts for considering the constitutionality of race-based districting.
However, even if I were to assume that strict scrutiny applies, and thus that it makes sense to consider the question, I would not share the majority’s hesitancy in concluding that North Carolina had a “compelling interest” in drawing District 12. In my view, the record identifies not merely one, but at least three acceptable reasons that may have motivated legislators to favor the creation of two such districts. Those three reasons easily satisfy the judicially created requirement that the state legislature’s decision be sup-. ported by a “compelling state interest,” particularly in a case in which the alleged injury to the disadvantaged class — i. e., the majority of voters who are white — is so tenuous.
First, some legislators felt that the sorry history of race relations in North Carolina in past decades was a sufficient reason for making it easier for more black leaders to participate in the legislative process and to represent the State in the Congress of the United States. 861 F. Supp., at 462-463. Even if that history does not provide the kind of precise guidance that will justify certain specific affirmative-action programs in particular industries, see ante, at 909-910, it surely provides an adequate basis for a decision to facilitate the election of representatives of the previously disadvantaged minority.
As a class, state legislators are far more likely to be familiar with the role that race plays in electoral politics than they are with the role that it plays in hiring decisions within discrete industries. Moreover, given the North Carolina Legislature’s own recent experience with voting rights litigation, see Thornburg v. Gingles, 478 U. S. 30 (1986), as well as the fact that 40 of the State’s districts are so-called covered jurisdictions which the Attorney General directly moni *942 tors as a result of prior discriminatory practices, see 42 U. S. C. § 1973c (1988 ed.), there is less reason to assume that the state legislative judgments under review here are based on unwarranted generalizations than may be true in other contexts. Thus, even if a desire to correct past discrimination did not itself drive the legislative decision to draw two majority-minority districts, it plainly constituted a legitimate and significant additional factor supporting the decision to do so. 861 F. Supp., at 472-473.
Second, regardless of whether § 5 of the Act was actually violated, I believe the State’s interest in avoiding the litigation that would have been necessary to overcome the Attorney General’s objection to the original plan provides an acceptable reason for creating a second majority-minority district. It is entirely proper for a State whose past practices have subjected it to the preclearance obligation set forth in § 5 to presume that the Attorney General’s construction of the Act is correct, and to take corrective action rather than challenging him[17] in Court.
Moreover, even if the State’s interest in avoiding a court challenge that might have succeeded does not constitute a sufficient justification for its decision to draw a majority-minority district, the State plainly had an interest in complying with a finding by the Attorney General that it reasonably believed could not have been successfully challenged in court. The majority disagrees, relying on our analysis in Miller v. Johnson, 615 U. S., at 920-925. That reliance is misplaced.
In Miller, the Court concluded that Georgia had simply acceded to the Attorney General’s unreasonable construction of § 5 without performing any independent assessment of its validity. Ibid. By contrast, the District Court here found as a factual matter that the legislature’s independent assess *943 ment of the reasons for the Attorney General’s denial of pre-clearance led it to the reasonable conclusion that its 11-white district plan would violate the purpose prong of §5. 861 F. Supp., at 474. As a result, I do not accept the Court’s conclusion that it was unreasonable for the State to believe that its decision to draw 1 majority-minority district out of 12 would have been subject to a successful attack under the purpose prong of § 5. Ante, at 911-913.
I acknowledge that when North Carolina sought preclearance it asserted nondiscriminatory reasons for deciding not to draw a second majority-minority district. See 861 F. Supp., at 480, n. 9 (Vorhees, C. J., dissenting). On careful reflection, however, the legislature concluded that those reasons would not likely suffice in a federal action to challenge the Attorney General’s ruling. The District Court found that conclusion to be reasonable. Id., at 474. I am mystified as to why this finding does not deserve our acceptance. Nor do I understand the Court’s willingness to credit the State’s declarations of nondiscriminatory purpose in this context, ante, at 912-913, in light of its unwillingness to accept any of North Carolina’s race-neutral explanations for its decision to draw District 12, ante, at 905-906.
Third, regardless of the possible outcome of litigation alleging that §2 of the Voting Rights Act would be violated by a plan that ensured the election of white legislators in 11 of the State’s 12 congressional districts, the interest in avoiding the expense and unpleasantness of such litigation was certainly legitimate and substantial. That the legislature reasonably feared the possibility of a successful § 2 challenge cannot be credibly denied.[18]
*944 In the course of the redistricting debate, numerous maps had been presented showing that blacks could constitute more than 50 percent of the population in two districts. 861 F. Supp., at 460-461, 474. The District Court found that these plans had demonstrated that “the state’s African-American population was sufficiently large and geographically compact to constitute a majority in two congressional districts.” Id., at 464.
Moreover, the Attorney General denied preclearance on the ground that North Carolina could have created a second majority-minority district that was, under any reasonable standard, geographically compact. Id., at 461-462; Shaw I, 509 U. S., at 635. Maps prepared by the plaintiff-intervenors for this litigation conclusively demonstrate that two compact, majority-minority districts could indeed have been drawn. 861 F. Supp., at 464-465; Plaintiff-Intervenors’ Exh. 301, A2-A3.
Even if many of the maps proposing two majority-African-American districts were not particularly compact, the legislature reasonably concluded that a federal court might have determined that some of them could have provided the basis for a viable vote dilution suit pursuant to Thornburg v. Gingles, 478 U. S., at 50-51. 861 F. Supp., at 474. That conclusion is particularly reasonable in light of the fact that Gingles was a case fresh in the minds of many of North Carolina’s state legislators, id., at 463. There, the State challenged the plaintiffs’ §2 claim by pointing to the oddly configured lines that defined their proposed majority-minority districts. See Gingles v. Edmisten, 590 F. Supp. 345, 373 (EDNC 1984). As we know, North Carolina’s defense to §2 liability proved unsuccessful in that instance, even though the District Court acknowledged that the “single-member district specifically suggested by the plain *945 tiffs as a viable one is obviously not a model of aesthetic tidiness.” Id., at 374.[19]
Finally, even if the record shows that African-American voters would not have composed more than 50 percent of the population in any plan containing two compact, majority-minority districts, the record reveals that it would have been possible to have drawn a map containing one compact district in which African-Americans would have composed more than 50 percent of the population and another compact district in which African-Americans, by reason of the large presence of Native Americans, would have by far constituted the largest racial group. Plaintiff-Intervenors’ Exh. 301, A2-A3. Given our recent emphasis on considering the totality of the circumstances in §2 cases, we are in no position to rebuke a State for concluding that a 40-plus percent African-American district could provide a defense to a viable Gingles challenge as surely as could one with a 50.1 percent African-American population. See Johnson v. De Grandy, 512 U. S. 997, 1009-1012 (1994); Voinovich v. Quitter, 507 U. S. 146 (1993); Rural West Tennessee African-American Affairs Council, Inc. v. McWherter, 877 F. Supp. 1096 (WD Tenn.), aff’d, 516 U. S. 801 (1995).[20]

*946
>

Although the Court assumes that North Carolina had a compelling interest in avoiding liability under §2, ante, at 916, it avoids conclusively resolving that question because it holds that District 12 was not a “narrowly tailored” means of achieving that end. The majority reaches this conclusion by determining that District 12 did not “remedy” any potential violation of §2 that may have occurred. Ibid.
In my judgment, if a State’s new plan successfully avoids the potential litigation entirely, there is no reason why it must also take the form of a “remedy” for an unproven violation. Thus, the fact that no § 2 violation has been proved in the territory that constitutes District 12 does not show that the district fails to serve a compelling state interest. It shows only that a federal court, which is constrained by Article III, would not have had the power to require North Carolina to draw that district. It is axiomatic that a State should have more authority to institute a districting plan than would a federal court. Voinovich v. Quilter, 507 U. S., at 156-157.
That District 12 will protect North Carolina from liability seems clear. The record gives no indication that any of the potential §2 claimants is interested in challenging the plan that contains District 12. Moreover, as a legal matter, North Carolina is in a stronger position to defend against a § 2 lawsuit with District 12 than without it.
Johnson v. De Grandy expressly states that, at least in the context of single-member districting plans, a plaintiff cannot make out a prima facie case of vote dilution under § 2 unless he can demonstrate that his proposed map contains more majority-minority districts than the State’s. 512 U. S., at 1008. By creating a plan with two majority-minority dis *947 tricts here, the State would seem to have precluded potential litigants from satisfying that precondition.[21]
In addition, satisfaction of the so-called Gingles preconditions does not entitle an individual minority voter to inclusion in a majority-minority district. A court may conclude that a State must create such a district only after it considers the totality of the circumstances. A court would be remiss if it failed to take into account that the State had drawn majority-minority districts proportional to its minority population which include portions of the very minority community in which an individual minority plaintiff resides. Indeed, our recent decisions compel courts to perform just such a calculus. See Johnson v. De Grandy, 512 U. S., at 1012-1016; Voinovich v. Quilter, 507 U. S. 146 (1993); see also African American Voting Rights Legal Defense Fund, Inc. v. Villa, 54 F. 3d 1345, 1355-1357 (CA8 1995).
*948 Finally, North Carolina’s chosen means of avoiding liability will impose none of the burdens on third parties that have made the Court wary of voluntary, race-based state action in the past. No white employees or applicants stand to lose jobs on account of their race as a result of North Carolina’s actions. In fact, no white voters risk having their votes unlawfully diluted. At most, North Carolina’s chosen means will require that some people of both races will be placed in districts other than those to which they would have otherwise been assigned. Even assuming that “burden” is more onerous when it results from racial considerations, it does not rise to a level of injury that justifies a federal court intruding on the State’s discretion to formulate a plan that complies with the Voting Rights Act.
In fact, to the extent that plaintiffs in these cases premise their standing on the “representational” harms that they suffer, see supra, at 927-928, a State’s decision to locate a majority-minority district outside the area that suffers from acute, racial bloc voting would seem to diminish the likelihood that representatives in majority-minority districts will serve only the interests of minority voters. After all, a representative of a majority-minority district that does not suffer from racial bloc voting cannot safely ignore the interests of voters of either race. In this respect, the majority’s narrow tailoring requirement, by forcing States to remedy perceived § 2 violations only by drawing the district around the area in which the Gingles preconditions have been satisfied, has the perverse consequence of requiring States to inflict the very harm that supposedly renders racial gerrymandering challenges constitutionally cognizable.[22]
*949 Although I do not believe a judicial inquiry into “narrow tailoring” is either necessary or appropriate in these cases, the foregoing discussion reveals that the “narrow tailoring” requirement that the Court has fashioned is a pure judicial invention that unfairly deprives the legislature of a sovereign State of its traditional discretion in determining the boundaries of its electoral districts.[23] The Court’s analysis gives rise to the unfortunate suggestion that a State that fears a § 2 lawsuit must draw the precise district that it believes a federal court would have the power to impose. Such a proposition confounds basic principles of federalism, and forces States to imagine the legally “correct” outcome of a lawsuit that has not even been filed.
The proposition is also at odds with the course of the litigation that led to Gingles itself. In that case, the plaintiffs proposed a number of oddly configured majority-minority districts to prove their vote dilution claim. In implementing a remedy for the §2 violation, the federal court wisely permitted North Carolina to propose its own remedial districts, many of which were highly irregular in dimension. Indeed, so peculiar were some of the shapes' concocted by the State that the Gingles plaintiffs challenged them on the grounds that they constituted racial gerrymanders which failed to remedy the very violations that had given rise to the need for their creation, and that they reflected only grudging responses designed to protect incumbent officeholders. Gingles v. Edmisten, 590 F. Supp., at 381.
Although the District Court in Gingles acknowledged that the State’s plan was not the one that it would have implemented, it nonetheless concluded that the plan constituted a reasonable exercise of state legislative judgment. “[A] state legislature’s primary jurisdiction for legislative apportion *950 ment and redistricting must include the right, free of judicial rejection, to implement state policies that may fail to remedy to the fullest extent possible the voting rights violations originally found.” Id., at 382.
In dramatic contrast, the Court today rejects North Carolina’s plan because it does not provide the precise remedy that might have been ordered by a federal court, even though it satisfies potential plaintiffs, furthers such race-neutral legislative ends as incumbency protection and the preservation of distinct communities of interest, and essentially serves to insulate the State from a successful statutory challenge. There is no small irony in the fact that the Court’s decision to intrude into the State’s districting process comes in response to a lawsuit brought on behalf of white voters who have suffered no history of exclusion from North Carolina’s political process, and whose only claims of harm are at best rooted in speculative and stereotypical assumptions about the kind of representation they are likely to receive from the candidates that their neighbors have chosen.
V
It is, of course, irrelevant whether we, as judges, deem it wise policy to create majority-minority districts as a means of assuring fair and effective representation to minority voters. We have a duty to respect Congress’ considered judgment that such a policy may serve to effectuate the ends of the constitutional Amendment that it is charged with enforcing. We should also respect North Carolina’s conscientious effort to conform to that congressional determination. Absent some demonstration that voters are being denied fair and effective representation as a result of their race, I find no basis for this Court’s intervention into a process by which federal and state actors, both black and white, are jointly attempting to resolve difficult questions of politics and race that have long plagued North Carolina. Nor do I see how our constitutional tradition can *951 countenance the suggestion that a State may draw unsightly lines to favor farmers or city dwellers, but not to create districts that benefit the very group whose history inspired the Amendment that the Voting Rights Act was designed to implement.
Because I have no hesitation in concluding that North Carolina’s decision to adopt a plan in which white voters were in the majority in only 10 of the State’s 12 districts did not violate the Equal Protection Clause, I respectfully dissent.

 Tr. of Oral Arg. 58.

 Counsel went so far as to liken the State’s districting plan to state-run water fountains that are available to citizens of all races but are nevertheless labeled “Black” and “White.” He argued that the State’s race-based redistricting map constituted an unlawful racial classification in the same way that the signs above the fountains would. Although neither racial classification would deprive any person of a tangible benefit — water from both fountains and effective political representation would remain equally available to persons of all races — each would be unconstitutional because of the very fact that the State had espoused a racial classification publicly. Id., at 5-6.

 There, a majority of the Court stated that “[w]e have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen’s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III case or controversy.” Lujan v. Defenders of Wildlife, 504 U. S., at 573-574.

 The Court’s decisions in Powers v. Ohio, 499 U. S. 400 (1991), and Batson v. Kentucky, 476 U. S. 79 (1986), are not to the contrary. There, we have held that defendants have third-party standing, no matter what their race, to assert the rights of jurors, who have been deprived because of their race of a benefit available to all others. No voter in this litigation *925 has shown either that he has uniquely been denied an otherwise generally available benefit on account of race, or that anyone else has.

 As I have explained, even if the Hays test showed that much, it would still only demonstrate that the State had used geography, rather than race, to select the citizens who would be deprived of a color-blind dis-tricting process.

 That is particularly true here because the author of the District Court opinion was also the author of the District Court opinion in Gingles v. Edmisten, 590 F. Supp. 345 (EDNC 1984), aff’d in part, rev’d in part, Thornburg v. Gingles, 478 U. S. 30 (1986).

 For example, the State argued that it drew the majority-minority district under review so that it would follow precinct lines, but the Court found that precinct lines had been relied on only because they happened to facilitate the State’s effort to achieve a particular racial makeup. Similarly, the State argued that District 11 was drawn in order to ensure that communities of interest would be kept within a single district, but the Court found that no such communities could be found within the district’s boundaries. See Miller v. Johnson, 515 U. S., at 918-920.

 It is unclear whether the majority believes that it is the combination of these two pieces of evidence that satisfies Miller, or whether either one would suffice.

 Citing to trial and deposition testimony, the majority also relies on a statement by North Carolina’s chief mapmaker, Gerry Cohen, that the creation of a majority-minority district was the “‘principal reason’” for the configurations of District 1 and District 12. Ante, at 906. Mr. Cohen’s more complete explanation of the ‘“principal reason’” was to create “two majority black districts that had communities of interest within each one.” Tr. 514. What Mr. Cohen admitted, therefore, was only that the State intentionally drew a majority-minority district that would respect traditional districting principles. Moreover, Mr. Cohen’s “admission” in his deposition only pertained to District 1. App. 675. Finally, he explained in his deposition that “other reasons” also explained that district’s configuration. Ibid. Absent a showing that those “other reasons” were race based, Mr. Cohen’s admission does not show that North Carolina *934 subordinated race-neutral districting criteria in drawing District 1; it shows only that the need to comply with federal law was critical.

 In DeWitt v. Wilson, 856 F. Supp. 1409 (ED Cal. 1994), for example, the State conceded that compliance with §5 of the Voting Rights Act constituted the one unavoidable limitation on its redistricting process. Id., at 1410. Nevertheless, we affirmed the District Court’s conclusion that strict scrutiny did not apply because the State gave significant weight to several race-neutral considerations in meeting that goal. Id., at 1415. Moreover, in Miller v. Johnson, 515 U. S. 900 (1995), the Court applied strict scrutiny only after it concluded that the State considered only race in adding African-American voters to District 11; it did not hold that Georgia’s general admissions about its desire to comply with federal law themselves sufficed. Id., at 917-919.

 The State Constitution sets forth no limitation on districting for federal offices. Moreover, the state-prepared 1991 Legislator’s Guide to North Carolina Legislative and Congressional Redistricting points out *935 that the state-law prohibition against dividing counties in formulating state electoral districts was eliminated in the 1980's. See Legislator’s Guide to North Carolina Legislative and Congressional Redistricting 12 (Feb. 1991).

 Indeed, the State’s guide to redistricting specifically informed state legislators that compactness was of little legal significance. “Neither the State nor federal constitution requires districts to be compact. Critics often refer to the lack of compactness of a particular district or group of districts as a sign of gerrymandering, but no court has ever struck down a plan merely on the basis that it did not appear to be compact. Although there are geometric methods for measuring the compactness of an area, these methods have not been recognized as judicial standards for evaluating the compactness of districts.
“The recent decision in Davis v. Bandemer . . . mentions irregularly-shaped districts as a possible sign of gerrymandering but makes clear that irregular shapes alone do not invalidate a redistricting plan.” Ibid.

The State’s decision to give little weight to how the district would look on a map is entirely justifiable. Although a voter clearly has an interest in being in a district whose members share similar interests and concerns, that interest need not, and often is not, vindicated by drawing districts with attractive shapes. “[The Districts’] perceived ‘ugliness’— their extreme irregularity of shape — is entirely a function of an artificial perspective unrelated to the common goings and comings of the citizen-voter. From the mapmaker’s wholly imaginary vertical perspective at 1:25,000 or so range, a citizen may well find his district’s one-dimensional, featureless shape aesthetically ‘bizarre,’ ‘grotesque,’ or ‘ugly.’ But back down at ground or eye-level, viewing things from his normal closely-bound horizontal perspective, the irregularity of outline or exact volume of the district in which he resides surely is not a matter of any great practical consequence to his conduct as a citizen-voter.” 861 F. Supp. 408, 472, n. 60 (EDNC 1994).
In the same vein, I doubt that residents of hook-shaped Massachusetts receive less effective representation than their counterparts in perfectly rectangular Wyoming, or that the voting power of residents of Hawaii *937 is in any way impaired by virtue of the fact that their State is not even contiguous.

 It is ironic that despite the clear indications that party politics explain the district’s odd shape, the Court affirmed the District Court’s dismissal of the plaintiffs’ partisan gerrymandering claim. See Pope v. Blue, 506 U. S. 801 (1992).

 Interestingly, the Justice Department concluded that it was the State’s impermissible desire to favor white incumbents over African-American voters that explained North Carolina’s refusal to create a second district and thus gave rise to a violation of the purpose prong of § 5 of the Voting Rights Act. See Shaw I, 509 U. S. 630, 635 (1993). Of course, the white plaintiffs before us here have no standing to object to District 12 on similar grounds.

 Although the majority asserts that North Carolina “subordinated” traditional districting principles to racial concerns because “[r]ace was the criterion that, in the State’s view, could not be compromised,” ante, at 907, no evidence suggests that North Carolina would have sacrificed traditional districting principles in order to draw a second majority-minority district. Rather, the record reveals that the State chose District 12 over other options so that its plan would remain faithful to traditional, race-neutral districting criteria. If strict scrutiny applies even when a State draws a majority-minority district that respects traditional district- *940 ing principles, then I do not see how a State can ever create a majority-minority district in order to fulfill its obligations under the Voting Rights Act without inviting constitutional suspicion. I had thought that the “demanding” standard Miller established, Miller v. Johnson, 515 U. S., =at 928 (O’Connor, J., concurring), as well as our summary affirmance in DeWitt, reflected our determination that States should not be so constrained.

 Although Attorney General Reno has endorsed the position taken by the Republican administration in 1991, it was her male predecessor who refused to preclear the State’s original plan.

 While the majority is surely correct in stating that the threat of a lawsuit, however unlikely to succeed, does not constitute a compelling interest, ante, at 908-909, n. 4, it does not follow that a State has no compelling interest in avoiding litigation over a substantial challenge. Here, of course, the District Court found that North Carolina premised its decision to draw a second majority-minority district on its reasonable conclusion *944 that it would otherwise be subject to a successful §2 challenge, not a “meritless” one. Ibid.

 Interestingly, although this Court in Thornburg v. Gingles held that §2 plaintiffs must demonstrate that they live in “compact” majority-minority districts, we affirmed the District Court which had found that the plaintiffs’ proposed districts were contiguous but not compact. 478 U. S., at 38. Arguably, therefore, the State could have reasonably concluded that the maps proposing District 12 would have themselves provided the foundation for a viable § 2 suit. For a discussion of how compact “compact” districts must be, see Karlan, Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation, 24 Harv. Civ. Rights-Civ. Lib. L. Rev. 173, 199-213 (1989). See also Dillard v. Baldwin County Bd. of Ed., 686 F. Supp. 1459, 1465-1466 (MD Ala. 1988); Houston v. Lafayette County, Miss., 56 F. 3d 606, 611 (CA5 1995).

 Moreover, Mr. Cohen, the State’s chief mapmaker, testified at trial that in statewide elections, Native Americans and African-Americans in the southeastern portion of North Carolina had voted for the same candidates. Tr. 411-412.

 The majority’s assertion that De Grandy only requires a plaintiff to show that more “reasonably compact” majority-minority districts could have been drawn would seem to expand dramatically a State’s potential liability under §2. Ante, at 916, n. 8. I would have thought that a State that had drawn three majority-minority districts, one of which was “reasonably compact” and two of which straggled in order to preserve certain distinctive communities of interest, would at the very least be immune to a challenge by a single African-American plaintiff bearing a map proposing to draw but two compact majority-minority districts. The Court’s expansive notion of §2 liability, combined with its apparent eagerness to subject all legislative attempts to comply with that Act to strict scrutiny, will place many States in the untenable position of facing substantial litigation no matter how they draw their maps. See Miller v. Johnson, 515 U. S., at 949 (Ginsburg, J., dissenting).
Of course, a State that unfairly “packs” African-American voters into a limited number of districts may be subject to a § 2 challenge on the ground that it failed to create so-called “influence” districts, and perhaps the majority means to endorse that proposition as well. I note here, however, that there is no indication that such a challenge could be successfully brought against North Carolina’s two majority-minority district plan, which creates districts with only bare African-American majorities.

 The Court’s strict analysis in this case is in some tension with the more reasonable approach endorsed by Justice O’Connor this same day. On her view, state legislatures seeking to comply with the Voting Rights Act clearly possess more freedom to draw majority-minority districts than do federal courts attempting to enforce it. Bush v. Vera, post, at 994 (O’Connor, J., concurring).

 That judicial creativity rather than constitutional principle defines the narrowing tailoring requirement in this area of our law is clear from Bush’s quite different analysis of the same question. See Bush, post, at 977.