Timothy A. DeWITT, Stephen J. DeWitt, Plaintiffs,

v.

Pete WILSON, Governor of the State of California; March Fong Eu, Secretary of State of the State of California, Defendants.

No. CIV–S–93–535 EJG/JFM.

United States District Court, E.D. California, Sacramento Division.

June 27, 1994.

Timothy A. DeWitt, Richmond, for plaintiffs.

Shelley Anne Chang, Sacramento, for defendants.

Before HUG, Circuit Judge, and GARCIA and BURRELL, District Judges.

## MEMORANDUM OPINION AND ORDER

HUG, Circuit Judge:

Plaintiffs, residents of California qualified and duly registered to vote in the State, filed suit in the district court for the Eastern District of California on March 30, 1993, challenging California's 1992 redistricting plan, adopted by the State in *Wilson v. Eu,* 1 Cal.4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992). Plaintiffs raised three causes of action challenging the constitutionality of the redistricting plan. Claims one and two challenged the constitutionality of California Election Code, section 25003, a term limitation statute, and section 6402(b), a statute permitting candidates to run for only one congressional seat. The third claim for relief alleges that California's redistricting plan relied on race-conscious reapportionment and diluted white voter strength in violation of the Equal Protection Clause of the Fourteenth and Fifteenth Amendments.

The court, sitting with a single judge, dismissed causes one and two as nonjusticiable. Pursuant to 28 U.S.C. § 2284(a), the court certified the reapportionment claim to be heard by a three judge district court. Pursuant to 28 U.S.C. § 2284(b)(1), the Chief Judge of the United States Court of Appeals for the Ninth Judicial Circuit appointed this panel to hear this case.

The parties filed cross motions for summary judgment. The motions were heard on January 7, 1994. After considering the parties' written and oral arguments, the record, and case law in this matter, we deny plaintiffs' motion for summary judgment and grant the State's motion for summary judgment.

## FACTS

On September 23, 1991, Governor Wilson vetoed the California legislature's reapportionment plan. Recognizing the legislative impasse and the importance of having a plan in place prior to the upcoming 1992 elections, the California Supreme Court issued a mandate and appointed three retired California judges to serve as Special Masters to resolve the election year crisis.

The Masters were directed to hold public hearings to permit the presentation of evidence and argument with respect to proposed plans of reapportionment. *Wilson,* 4 Cal.Rptr.2d at 381, 823 P.2d at 547. The Masters were further directed to compile a report and recommendation on reapportionment, basing the report on the public hearings and the guiding principles of the Federal Voting Rights Act of 1965, as amended (42 U.S.C. § 1973 et seq.), federal law pertinent to redistricting, the provisions of article XXI, section 1 of the California Constitution, and the criteria developed by an earlier panel of Special Masters for the reapportionment plans adopted by the California Supreme Court in 1973, *see Legislature v. Reinecke,* 10 Cal.3d 396, 110 Cal.Rptr. 718, 516 P.2d 6 (1973). *Wilson,* 4 Cal.Rptr.2d at 383, 823 P.2d at 549.

The two relevant sections of the Voting Rights Act are sections 2 and 5. Section 2 of the Voting Rights Act forbids state voting procedures which abridge voting rights "on account of race or color" and states that redistricting plans which provide "less opportunity [to minorities] than other members of the electorate to participate in the political process and to elect representatives of their choice" abridge voting rights. 42 U.S.C. § 1973 (Supp.1994). Section 5 of the Act prohibits a region subject to its provisions from implementing changes in any "standard, practice, or procedure with respect to voting" without authorization from the United States Attorney General. 42 U.S.C. § 1973c. Four California counties, Kings, Merced, Monterey, and Yuba, were subject to section 5; and, thus, the Masters had to devise a plan that would gain preclearance.

The state constitutional standards required that the Masters comply with the following redistricting procedures:

(1) consecutively numbered single-member districts, (2) "reasonably equal" populations among districts of the same type, (3) contiguous districts, and (4) "respect" for the "geographical integrity of any city, county, or city and county, or of any geographical region" to the extent possible without violating the other standards.

Cal. Const. art. XXI, § 1.

The redistricting criteria established in *Reinecke* called for:

(1) equality of population, (2) contiguity and compactness of districts, (3) respect for county and city boundaries, (4) preservation of the integrity of the state's geographical regions, (5) consideration of the "community of interests" of each area, (6) formation of state senatorial districts from adjacent assembly districts ("nesting"), and use of assembly district boundaries in drawing congressional district boundaries, and (7) reliance on the current census, and on undivided census tracts.

*Wilson,* 4 Cal.Rptr.2d at 383, 823 P.2d at 549.

With these criteria in mind, the Masters conducted six days of public hearings in Sacramento, San Francisco, San Diego, and Los Angeles, and reviewed the transcripts from 12 public hearings held by the California State Senate on redistricting. They also considered 22 proposed redistricting plans submitted by various public and private organizations. The Masters did not adopt any one of the 22 proposed plans because each of them, in one manner or another, could not satisfy the redistricting criteria the California Supreme Court required to be followed. Thus, the Masters developed their own redistricting plan.

In approving the Masters' Report, the California Supreme Court stated:

As the Report observes, population equality must be deemed the primary reapportionment criterion, being mandated by the provisions of the federal Constitution. Under the Masters' plans, each legislative district will vary by less than 1 percent from "ideal" equality, while each congressional district will vary by less than 0.25 percent. We find these minor deviations are amply justified by "legitimate state objectives," namely, the need to form reasonably compact districts, to use census tracts rather than blocks in forming districts, and to comply with the Voting Rights Act.

*Wilson,* 4 Cal.Rptr.2d at 385–86, 823 P.2d at 551–52 (citations omitted).

With regard to the Voting Rights Act, the California Supreme Court stated:

The Report discusses at length the Masters' close attention to the provisions of the Voting Rights Act, observing that in view of present uncertainties concerning the scope and intent of the act, the Masters "endeavored to draw boundaries that will withstand section 2 challenges under any foreseeable combination of factual circumstances and legal rulings." Their efforts, in this regard, were in part stimulated by the need to provide new districts for the forthcoming June Primary Election. In that connection, the Secretary of State in a brief filed herein urged the Masters to give the Voting Rights Act "the highest possible consideration in order to minimize the risk of challenge and resulting delay."

Initially, the Masters attempted to reasonably accommodate the interests of every "functionally, geographically compact" minority group of sufficient voting strength to constitute a majority in a single-member district.

As explained by the Masters, the functional aspect of geographical compactness takes into account the presence or absence of a sense of community made possible by open lines of access and communication. We approve the Masters' use of such an approach in determining the compactness of a particular minority group for purposes of assuring its protection under the Voting Rights Act.

*Id.* 4 Cal.Rptr.2d at 383–84, 823 P.2d at 549–50 (citations omitted).

### DISCUSSION

█ Plaintiffs contend that because the Masters' redistricting plan considered race in redrawing the districts, that this constitutes

suspect "racial gerrymandering" actionable under the Equal Protection Clause, as set forth in *Shaw v. Reno,* — U.S. —, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Plaintiffs further contend that summary judgment should be granted in their favor because the Masters' plan is not, as required by *Shaw,* narrowly tailored to meet a compelling government interest. We disagree.

In *Shaw v. Reno,* the Supreme Court held that the appellants pled a cause of action under the Equal Protection Clause of the Fourteenth Amendment based on an allegation that the State of North Carolina had practiced racial gerrymandering when it reapportioned the State's voting districts. — U.S. at —, 113 S.Ct. at 2832, 125 L.Ed.2d at 536. The two congressional districts challenged in *Shaw* were drawn to create two majority black districts in the state. The plaintiffs in *Shaw* alleged that the state had created an unconstitutional racial gerrymander. Their claim was that the North Carolina General Assembly deliberately "create[d] two Congressional Districts in which a majority of black voters was concentrated arbitrarily—without regard to any other considerations, such as compactness, contiguousness, geographical boundaries, or political subdivisions with the purpose to create Congressional Districts along racial lines and to assure the election of two black representatives to Congress." *Id.* — U.S. at —, 113 S.Ct. at 2818, 125 L.Ed.2d at 522 (quotations omitted).

The first district challenged in *Shaw* was somewhat hook shaped. At one end it shot out with finger-like extensions. *Id.* — U.S. at —, 113 S.Ct. at 2820–21, 125 L.Ed.2d at 521. It has been compared to a "Rorschach ink-blot test" and a "bug splattered on a windshield" *Id.*

The second majority black district challenged in *Shaw* was 16 miles long and for much of its length was no wider than an interstate highway. *Id.* The district wound its way, in snake-like fashion, gobbling up black enclaves. *Id.* It passed through 10 counties, divided towns, and, at one point, remained contiguous only because it intersected at a single point with two other districts before crossing over them. *Id.*

The Court in *Shaw* defined racial gerrymandering as "the deliberate and arbitrary distortion of district boundaries ... for [racial] purposes." *Id.* — U.S. at —, 113 S.Ct. at 2823, 125 L.Ed.2d at 524 (quoting *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986))[1]. It then held that the appearance of the anomalous district boundaries was sufficient to state a claim under the Equal Protection Clause for racial gerrymandering.

*Shaw* held when districts are drawn in such an extremely irregular fashion as to be unexplainable, other than being based solely on race, a claim under the Equal Protection Clause for racial gerrymandering can be stated. *Shaw,* — U.S. at —, 113 S.Ct. at 2832, 125 L.Ed.2d at 536. Redistricting based solely on race affronts our sense of voter equality because it creates districts with residents who have little in common with each other except the color of their skin. It fails to take into account geographic and political boundaries, age, economic status, and the community in which the people live. *Id.* — U.S. at —, 113 S.Ct. at 2827, 125 L.Ed.2d at 529. Redistricting based solely on race assumes that members of the same race think alike, share the same political interests, and prefer the same candidates at the polls, not because of shared community interests, but only because of their skin pigmentation. It is the equivalent of political apartheid. When a district is drawn in such a manner that it rationally can only be understood as race-based, then a cause of action arises under the Equal Protection Clause. *Id.* — U.S. at —, 113 S.Ct. at 2832, 125 L.Ed.2d at 536. Thus, if an allegation of deliberate and arbitrary redistricting based solely on race is not contradicted by the State, then it must be determined whether the redistricting plan is narrowly tailored to further a compelling governmental interest. *Id.*

---

1. To the extent that *Hays v. Louisiana,* 839 F.Supp. 1188 (W.D.La.1993), gives a broader meaning to racial gerrymandering, we disagree.

The Court in *Shaw* specifically noted that "we express no view as to whether the intentional creation of majority-minority districts, without more, always gives rise to an equal protection claim. We hold only that on the facts of this case, plaintiffs have stated a claim sufficient to defeat the state appellees' motion to dismiss." *Id.* —— U.S. at ——, 113 S.Ct. at 2822, 125 L.Ed.2d at 530 (quotation omitted).

The narrow holding of *Shaw* is that "a plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id. Shaw* applies to redistricting plans that on their face are so dramatically irregular that they can only be explained as attempts to segregate by the races for purposes of voting without regard for traditional redistricting principles. *Id.* —— U.S. at ——, 113 S.Ct. at 2823–24, 125 L.Ed.2d at 525.

■ The California redistricting plan does not fit within the narrow holding of *Shaw*. As the California Supreme Court noted, the Masters' Report sought to balance the many traditional redistricting principles, including the requirements of the Voting Rights Act. *Wilson*, 4 Cal.Rptr.2d at 383, 823 P.2d at 549. No bizarre boundaries were created. The effort to comply with the Voting Rights Act emphasized geographical compactness, which "takes into account the presence or absence of a sense of community made possible by open lines of access and communication." *Id.* This case, therefore, involves the constitutionality of a redistricting plan that created majority-minority districts in a manner that was consistent with traditional redistricting principles, not based solely on race, and not involving extremely irregular district boundaries. It involves the question left open by the Court in *Shaw*.

As the Court noted in *Shaw*,

A reapportionment statute typically does not classify persons at all; it classifies tracts of land, or addresses. Moreover, redistricting differs from other kinds of state decision making in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors.

*Id.* —— U.S. at ——, 113 S.Ct. at 2826, 125 L.Ed.2d at 528. Thus, in redistricting, consciousness of race does not give rise to a claim of racial gerrymandering when race is considered along with traditional redistricting principles, such as compactness, contiguity, and political boundaries.

Redistricting had been used to dilute minority voting power by spreading minority voters throughout different districts or packing minority voters into a single district. *Id.* —— U.S. at ——, 113 S.Ct. at 2823, 125 L.Ed.2d at 524. It is this problem the Voting Rights Act sought to remedy. Consciousness of race in redistricting through the creation of majority-minority districts, properly performed, alleviates this inequity. Thus, the Supreme Court has stated that

it [is] permissible for a State, employing sound districting principles such as compactness and population equality, to attempt to prevent racial minorities from being repeatedly outvoted by creating districts that will afford fair representation to the members of those racial groups who are sufficiently numerous and whose residential patterns afford an opportunity of creating districts in which they will be in the majority.

*United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 168, 97 S.Ct. 996, 1011, 51 L.Ed.2d 229, 247 (1977).

The Masters did not draw district lines based deliberately and solely on race, with arbitrary distortions of district boundaries. The Masters, in formulating the redistricting plan, properly looked at race, not as the sole criteria in drawing lines but as one of the many factors to be considered. We agree with the California Supreme Court that the Masters' Report evidences a judicious and proper balancing of the many factors appropriate to redistricting, one of which was the consideration of the application of the Voting Rights Act's objective of assuring that minor-

ity voters are not denied the chance to effectively influence the political process.

The Masters' Report carefully analyzed and reconciled the redistricting requirements of the State Constitution, the *Reinecke* case, and the Voting Rights Act. *See Wilson,* 4 Cal.Rptr.2d at 405–09, app. I, 823 P.2d at 571–75. In addition to the fundamental requirement of population equality, the Masters noted the state requirements of contiguity, geographic integrity, community of interest, and compactness. In discussing the application of the latter four traditional redistricting principles, the Masters' Report states:

> These four criteria all are addressed to the same goal, the creation of legislative districts that are effective, both for the represented and the representative. The constitutional requirement of "contiguity" is not an abstract or geometric technical phrase. It assumes meaning when seen in combination with concepts of "regional integrity" and "community of interest."
> .... "The territory included within a district should be contiguous and compact, taking into account the availability of transportation and communication." In addition, "social and economic interests common to the population of an area [e.g.] an urban area, a rural area, an industrial area or an agricultural area" should be considered.
> .... Compactness does not refer to geometric shapes but to the ability of citizens to relate to each other and their representatives and to the ability of representatives to relate effectively to their constituency. Further, it speaks to relationships that are facilitated by shared interests and by membership in a political community, including a county or city.

*Id.* 4 Cal.Rptr.2d at 408–09, 823 P.2d at 574–75 (citations and footnotes omitted).

In discussing the particular relationship of these criteria to the Voting Rights Act, the Masters' Report states:

> We find no conflict between the Act and the above state criteria. Indeed, quite the contrary. As has already been noted, the Act protects only "geographically compact" minority groups. The major divisions of the state as we have defined them above divide no such minority groups. (The boundary mountain ranges, for example, are virtually unpopulated areas with few roads crossing them; 50 to 100 miles separates populated areas on either side of these ranges.) Similarly, the values expressed in the concept of contiguity, community of interest, and respect for local government boundaries—the concept of "functional compactness"—is completely consistent with the concept of "geographically compact" minority districts. Indeed, use of these criteria reinforces the Act's guarantee to minority groups to have an equal opportunity "to participate in the political process." As suggested above, political effectiveness can be enhanced by membership and participation in community affairs: candidates for public office can be recruited and nurtured, local media may be better utilized (including the foreign language press), grassroots organizing and campaigning are more viable. As suggested in the June 1980 ballot arguments in favor of Article XXI, use of these criteria can avoid the creation of "districts that are confusing, unfair and unrepresentative."
>
> In sum, we find the criteria underlying the drawing of district boundaries, i.e., criteria found in the federal and state constitutions, in the Act, and in the decision of the California Supreme Court in *Reinecke IV, supra,* not only reconcilable, but compatible. The criteria have guided our deliberations and informed our decisions.

*Id.,* 4 Cal.Rptr.2d at 409, 823 P.2d at 575 (citations omitted).

Adhering to their definitions of contiguity and compactness, the Masters refused to create districts that wound in snake-like fashion or resembled a "Rorschach inkblot test" found objectionable in *Shaw.* This is exemplified in the Masters' refusal to create a district which ran along the Sierra Nevadas where no road exists and where populated areas were separated by 130 miles, and their refusal to "extend a long arm between the Richmond District and 'Chinatown' in order to bring these two areas into the same district." *Wilson,* 4 Cal.Rptr.2d at 411–12, 415 n. 44, 823 P.2d at 577–78, 581 n. 44. The

Masters noted that these were only two of the many examples of bizarrely shaped districts suggested to them, and that a cogent justification for any bizarre-shaped district would be necessary before they could recommend them. *Id.* 4 Cal.Rptr.2d at 411 n. 24, 823 P.2d at 577 n. 24. Thus, the Masters did not redistrict based solely on race, but showed depth and insight in considering race as a component of traditional redistricting principles.

 We conclude that the Masters' redistricting plan, as approved by the California Supreme Court, is not racial gerrymandering, but rather a thoughtful and fair example of applying traditional redistricting principles, while being conscious of race. Thus, we find that the plaintiffs have failed to state a claim of racial gerrymandering. We conclude that in the context of redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, that strict scrutiny is not required. However, if it were required, we conclude that this California redistricting plan has been narrowly tailored to meet a compelling state interest.

The Court has repeatedly emphasized that legislative reapportionment is primarily a matter for state determination. Most recently, in *Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1156–57, 122 L.Ed.2d 500, 513 (1993), the Court stated:

> Of course, the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law. But that does not mean that the State's powers are similarly limited. Quite the opposite is true: Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place. Time and again we have emphasized that " 'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.' "

*Id.* —— U.S. at ——, 113 S.Ct. at 1156, 122 L.Ed.2d at 513 (citations omitted). Unless the Voting Rights Act itself is found to be unconstitutional or unless the creation of majority-minority districts, in implementation of that Act, is found to be unconstitutional, it is difficult to see how California's carefully drawn plan, utilizing traditional redistricting principles, while seeking to comply with the requirements of the Voting Rights Act, can violate the Equal Protection Clause. We conclude that the redistricting plan adopted by the California Supreme Court appropriately balances the traditional reapportionment principles, does not involve racial gerrymandering, and does not violate the Fourteenth and Fifteenth Amendments.

 The appellants also contend that the reapportionment plan violates the Equal Protection Clause by unduly minimizing white voter strength. The asserted basis for this contention is that even though the districts are equated as to population, the registered voters in the white majority districts far exceed those in the majority-minority districts, giving greater impact to a vote in the latter districts. There is no merit to this contention; population, not voter registration, is the appropriate basis for apportioning districts. *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506, 531 (1964).

### ORDER

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED. The clerk is directed to enter judgment for the defendants.

IT IS SO ORDERED.