**Hazard CANNON, Norman Phillips, and Dan Sizemore, Plaintiffs,**

v.

**DURHAM COUNTY BOARD OF ELECTIONS, an official agency of the State of North Carolina; and the Durham County Board of Commissioners, Defendants.**

and

**Durham Committee on the Affairs of Black People, et al., Defendant–Intervenors.**

No. 5:96–CV–115–BR(3).

United States District Court, E.D. North Carolina.

March 6, 1997.

John C. Randall, Randall, Jervis & Hill, Durham, NC, for Plaintiff.

Thomas A. Farr, Maupin, Taylor, Ellis & Adams, Raleigh, NC, S.C. Kitchen, Durham, NC, Lowell L. Siler, Durham, NC, for Durham County Bd. of Elections, Durham County Bd. of Com'rs.

Irving L. Joyner, Durham, NC, for Durham Committee on the Affairs of Black People, Durham Branch of NAACP, Beverly Jones, Dr. William Bell, Mozell Robinson, Deborah Giles, John Jolly, Deborah Jolly, Harris C. Johnson, Sr., Ellen Mays, Clarence R. Jones.

Adam Stein, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, Chapel Hill, NC, for Jennifer McGovern, Steve Unruhe, Dabney Hopkins, Patricia N. Page, Page, McCullough, David Austin, Leigh Bordley, Margaret McReary.

ORDER

BRITT, District Judge.

This matter is before the court on motions for summary judgment by defendants and defendant-intervenors.[1]

### I. *Background*

As recited in the preliminary injunction order dated 1 April 1996, the relevant facts are as follows.

Pursuant to North Carolina General Statutes section 115C–68.1, the Board of Commissioners for the County of Durham prepared, adopted, and submitted to the North Carolina State Board of Education a plan for the merger of the Durham County public schools and the City of Durham public schools. (Compl. ¶ 10.) The plan was approved by the State Board. (*Id.*) Pursuant to the plan, the two school systems were merged into a new system called the Durham Public School System. (*Id.*) Under the merger plan, the school board for the new system is composed of seven members. (*Id.*) To reach this figure, Durham County is divided into four individual single-member districts each electing a school board representative. The four individual districts are then combined to form two larger districts each also electing a board member. The final member is elected at-large; thus, creating a system referred to as a 4–2–1 electoral structure. Before the plan was adopted, North Carolina General Statutes section 115C–35 mandated that the school board be composed of five members elected at-large. N.C. Gen. Stat. § 115C–35 (1995). The new plan creates three "majority-minority districts."[2] (*Cf.* Compl. ¶ 15.)

Some of the plaintiffs previously filed an action challenging the merger plan in state court. (*Id.* ¶ 10.) After an initial decision favorable to plaintiffs and while an appeal was pending, the North Carolina General Assembly passed a "curative" statute codified

---

1. For purposes of this order, these parties will be referred to collectively as "defendants."

2. A majority-minority district is one "'in which a majority of the population is a member of a specific minority group.'" *United States v. Hays,*

—— U.S. ——, ——, 115 S.Ct. 2431, 2433, 132 L.Ed.2d 635 (quoting *Voinovich v. Quilter,* 507 U.S. 146, 146–47, 113 S.Ct. 1149, 1151, 122 L.Ed.2d 500 (1993)).

at North Carolina General Statutes section 115C–68.3. (*Id.*) After section 115C–68.3 was enacted but before rendering a decision on the merits, the North Carolina Supreme Court remanded to the trial court for consideration of the effect of the new statute on the case. (*Id.*) Defendants then filed a motion to dismiss the case for mootness. (*Id.*) In their combined reply, verified affidavit, and motion for summary judgment, plaintiffs raised, for the first time, the argument that the school board election plan was discriminatory to white voters and that it violated the United States Constitution. (*Id.*) The trial court granted defendants' motion and dismissed plaintiffs' case. (*Id.*) The decision was reversed by the North Carolina Court of Appeals but ultimately affirmed by the North Carolina Supreme Court. (*Id.*) As to plaintiffs' discrimination claim, the North Carolina Supreme Court stated: "[W]e conclude that the issue is not properly before this Court. Plaintiffs never filed pleadings in this matter alleging racial discrimination and thus did not properly present the issue for determination by the trial court." *Cannon v. North Carolina State Bd. of Educ.,* 342 N.C. 399, 464 S.E.2d 43, 43 (1995).

Plaintiffs then brought suit in this court challenging, on constitutional grounds, the new method of electing school board members. Specifically, plaintiffs allege violations of the Privileges and Immunities Clause of Article IV, Sec. 2, the Fifth, Fourteenth, and Fifteenth Amendments, and 42 U.S.C. § 1973. The court will review each claim in turn.

## II. *Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate where there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The Fourth Circuit has articulated the summary judgment standard as follows:

> A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest on mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Patterson v. McLean Credit Union,* 39 F.3d 515, 518 (4th Cir.1994) (quoting *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994), 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994)).

## III. *Discussion*

### A. *Res Judicata*

■ Defendants first argue that plaintiffs' suit is barred by the doctrine of res judicata. Under the Full Faith and Credit statute, 28 U.S.C. § 1738 (1994), this court is obligated to look to the law of North Carolina to ascertain whether the prior state court judgment should be afforded preclusive effect in this federal action. *Davenport v. North Carolina Dep't. of Trans.,* 3 F.3d 89, 92 (4th Cir.1993).

■ Although the issues raised in the initial state court litigation differ from the legal theories presented in this case, defendants argue that res judicata operates to bar all related claims and thus plaintiffs are not entitled to a separate suit merely by shifting legal theories. The court is persuaded that this rule is established law in North Carolina. *See Holly Farm Foods, Inc. v. Kuykendall,* 114 N.C.App. 412, 442 S.E.2d 94, 97 (1994) ("Res judicata not only bars the relitigation of matters determined in the prior proceed-

ing but also all material and relevant matters within the scope of the pleadings, which the parties, in the exercise of reasonable diligence, could and should have brought forward.") (internal quotations omitted); *Rodgers Builders, Inc. v. McQueen*, 76 N.C.App. 16, 331 S.E.2d 726, 735 (1985) (holding that a party cannot avoid res judicata by shifting legal theories or asserting new grounds for relief from the same event), *rev. denied*, 315 N.C. 590, 341 S.E.2d 29 (1986).

 Notwithstanding, res judicata does not preclude this suit because defendants cannot satisfy all of the elements of the res judicata test. For res judicata to attach, there must have been a final judgment on the merits, in a prior action involving the same claim, between the same parties or those in privity with them. *Bockweg v. Anderson*, 333 N.C. 486, 428 S.E.2d 157, 161 (1993). While both parties concentrate their arguments on the issues of whether the claim is the same and whether privity exists, the court finds that res judicata is inapplicable because there was not a final judgment on the merits in the state court action. Reviewing the litany of state court proceedings, it appears that, although the superior court initially issued a ruling on the merits, the North Carolina Supreme Court subsequently remanded for further consideration in light of the curative statute enacted by the Legislature. On remand, plaintiffs' claims were dismissed as moot, a ruling ultimately affirmed by the supreme court.

It is important to note that the supreme court did not merely dismiss the appeal as moot. If so, operating under the *Munsingwear* doctrine,[3] the dismissal of the appeal would likely not have upset the original ruling unless the appellate court expressly vacated the lower court's ruling in the process. In that instance, defendants would likely be able to rely on the initial superior court ruling to satisfy the judgment on the merits requirement.

However, in this case, the supreme court did not merely moot the appeal but remanded the entire claim to the superior court to reconsider in light of intervening developments. This action effectively vacated the superior court's initial opinion. After the superior court then dismissed the claim as moot and the supreme court affirmed, the prior opinions were no longer enforceable or viable.

Therefore, the question becomes whether a dismissal for mootness qualifies as a final judgment on the merits. Unfortunately, no North Carolina court has addressed this issue. Thus, because this issue presents a case of first impression, the court will attempt to best predict how the North Carolina Supreme Court would resolve the issue. *See Roe v. Doe*, 28 F.3d 404, 406 (4th Cir.1994); *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192, 1195 (4th Cir.1982). Borrowing from other jurisdictions, it appears well settled that a dismissal for mootness does not constitute a decision on the merits. *Ferguson v. Commercial Bank*, 578 So.2d 1234, 1236 (Ala. 1991); *Transamerica Ins. Co. v. National Roofing, Inc.*, 108 N.J. 59, 527 A.2d 864 (1987); *Farkas v. New York State Dep't. of Civil Serv.*, 114 A.D.2d 563, 494 N.Y.S.2d 178 (N.Y.App.Div.1985); *Fabrizio v. United States Suzuki Motor Corp.*, 362 Mass. 873, 289 N.E.2d 897 (1972). Instead, a dismissal based on mootness merely exposes a jurisdictional defect and does not operate to preclude a second claim. *Ostrow v. Higgins*, 722 P.2d 936, 938 (Alaska 1986).

In their briefs, defendants recite language offered by a North Carolina appellate court that "[i]n general, any dismissal other than a dismissal for lack of jurisdiction, for improper venue, or failure to join a necessary party, operates as an adjudication on the merits." *Hogan v. Cone Mills Corp.*, 63 N.C.App. 439, 305 S.E.2d 213, 215 (1983), *vacated on other grounds*, 315 N.C. 127, 337 S.E.2d 477 (1985). Contrary to the assertions of defendants, however, this dicta does not compel the court to hold that a "dismissal for mootness" serves as an adjudication on the merits simply because the *Hogan*

**3.** In *United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), the Supreme Court indicated that, if an appeal is mooted, a party must secure a vacatur of the lower court judgment in order to avoid subsequent attribution of any res judicata effect to the unreviewed lower court judgment.

court did not expressly mention it. Instead, rather than undermining this court's ruling, the *Hogan* language offers further support because a dismissal for mootness is simply a type of dismissal based on lack of jurisdiction. Accordingly, res judicata does not function to bar this current litigation because defendants have not demonstrated a prior judgment on the merits.

### B. *Voting Rights Act Claim*

Moving to the substantive claims, plaintiffs allege a violation under § 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1994). To succeed on a claim under § 2, plaintiffs must satisfy the proof scheme promulgated in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Gingles* lays out the following three preconditions to establishing a *prima facie* § 2 claim: (1) that the minority population "is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) that the minority group "is politically cohesive;" and (3) "that the [black] majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Id.* at 50–51, 106 S.Ct. at 2766–67.

If the threshold requirements are satisfied, § 2 commands that a challenging party must demonstrate that:

> based on the totality of circumstances ... the political processes leading to nomination or election in the ... political subdivision are not equally open to participation by members of a class of citizens protected by ... this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). In *Gingles*, the Supreme Court, referring to a Senate Report on § 1973(b), listed several of the relevant factors as follows: (1) the extent of any history of official discrimination in the political subdivision that touched the right of minority group members to register, vote, or otherwise participate in the democratic process; (2) the extent to which voting in the elections of the political subdivision is racially polarized; (3) the extent to which the political subdivision has used voting practices or procedures that may enhance the opportunity for discrimination against minority groups; (4) whether the members of the minority group have been denied access to the candidate slating process; (5) the extent to which members of the minority group in the political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Gingles*, 478 U.S. at 44–45, 106 S.Ct. at 2762–64.

Defendants contend that summary judgment is appropriate because plaintiffs fail to create a genuine issue of material fact as to either the preconditions or the totality of the circumstances prong. The court agrees. At no point do plaintiffs offer any documentation regarding the political cohesiveness of the white voters or whether the black voters act sufficiently as a bloc to preclude the election of preferred candidates of white voters.[4] In fact, plaintiffs do not even make the bare assertion that such is the case.

On the other hand, defendants have not only exposed plaintiffs' failure to offer evidence but have supplied data undermining

---

4. Other courts have discussed what type of evidence may be proffered to satisfy the *Gingles* test. *See Solomon v. Liberty County, Fla.*, 899 F.2d 1012, 1018–21 (11th Cir.1990), *cert. denied*, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). For example, to show political cohesiveness, plaintiffs could have offered statistical evidence estimating that a significant number of minority group members usually vote for the same candidate or performed regression analyses showing the correlation between the percentage of registered white voters in a district and the percentage of the vote a candidate received. *Id.* at 1019–20.

plaintiffs' ability to satisfy the *prima facie* test even if they had attempted. For example, defendants note that, although white registered voters were twice as numerous as black registered voters in the 1992 election, in the race for the at-large seat, a white candidate narrowly defeated another white candidate, garnering 54% of the vote and apparently splitting much of the white vote. (Def–Int.'s Br. in Supp. of Summ.J., p. 26 (citations included in text).) In this particular instance, the inference arises, albeit not a conclusive one, that political cohesion among white voters did not exist.

■ Plaintiffs take a similar course of action, or lack thereof, with respect to the totality of the circumstances prong. Despite admonitions by this court in the preliminary injunction order about plaintiffs' failure to supply evidence on this criterion, plaintiffs have again neglected to come forward with any evidence about the totality of the circumstances analysis. Instead, plaintiffs apparently ignore the well-established *Gingles* guidelines and rest entirely on their beliefs that the apportionment scheme is improper. Such generalized conclusions, however, will not suffice to meet their burden on summary judgment. Defendants have repeatedly illustrated plaintiffs' failure to meet or even offer evidence to satisfy the § 2 conditions. Accordingly, this claim cannot proceed.

## C. *Shaw Equal Protection Claim*

Although the complaint is somewhat unclear on the precise claims alleged, it appears, after further briefing from both parties, that plaintiffs are asserting, *inter alia*, a *Shaw* Equal Protection Claim under the Fourteenth Amendment. In *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), the Supreme Court held that

[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.

*Id.* at 649, 113 S.Ct. at 2828. The Supreme Court has further explained that a *Shaw* racial gerrymandering claim can also be supported by "direct evidence of legislative purpose" if available. *Miller v. Johnson*, —— U.S. ——, —— – ——, 115 S.Ct. 2475, 2488–89, 132 L.Ed.2d 762 (1995) (instructing that a plaintiff can use either circumstantial evidence of geometric shape and demographics or direct evidence of race-based decision-making to prove a Shaw violation).

In this case, however, it is not necessary to reach whether plaintiffs have offered sufficient evidence under either proof scheme. Instead, plaintiffs' claim must fail for lack of standing.

It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*United States v. Hays*, —— U.S. ——, ——, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (footnote, citations, and internal quotation marks omitted)). "In light of these principles, [the Supreme Court has] repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Id.* This rule "applies with as much force in the equal protection context as in any other." *Id.*

In *Hays*, the Supreme Court considered standing with regard to appellees' *Shaw* claim that the State of Louisiana's congressional districting plan was a racial gerrymander prohibited by the Fourteenth Amendment. *Id.* at ——, 115 S.Ct. at 2433. None of the *Hays* appellees lived in the majority-minority districts created by Louisiana's plan. *Id.* at ——, 115 S.Ct. at 2434.

The *Hays* Court noted: "Demonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to discern why a particular citizen was put in one district or another." *Id.* at ——, 115 S.Ct. at 2436. It continued:

Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action. . . . On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

*Id.* at ——, 115 S.Ct. at 2436 (citation omitted).

Applying these rules to the case at hand, the *Hays* Court held that appellees failed to produce evidence that they personally had been subjected to a racial classification. It found, therefore, that appellees lacked standing to assert their *Shaw* claim. *Id.* at —— —— ——, 115 S.Ct. at 2436–37.

■ In this case, it is undisputed that none of the plaintiffs reside in the majority-minority districts. Thus, plaintiffs must present specific evidence that they have personally been subjected to a racial classification. Since no such presentation has been made, plaintiffs lack standing to assert their *Shaw* claim. *Id.* at ——, 115 S.Ct. at 2436. *See also Shaw v. Hunt,* —— U.S. ——, ——, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207 (1996) (holding that appellants who did not reside in the racially gerrymandered districts and who did not provide specific evidence that they personally were assigned to their voting districts on the basis of race lack standing to assert a *Shaw* claim); *Bush v. Vera,* —— U.S. ——, ——, 116 S.Ct. 1941, 1951, 135 L.Ed.2d 248 (1996) (holding that plaintiff who does not reside in a majority-minority district and

has not alleged any specific facts showing that he personally has been subjected to a racial classification lacks standing to assert a racial gerrymandering claim).

### D. *Fourteenth and Fifteenth Amendment Claims*

■ To begin on these claims, the court notes that an analysis of Fifteenth Amendment protections is subsumed by the review under the Fourteenth Amendment for purposes of vote dilution apportionment challenges. *See Shaw v. Barr,* 808 F.Supp. 461, 469 (E.D.N.C.1992), *rev'd on other grounds,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *N.A.A.C.P., Inc. v. Austin,* 857 F.Supp. 560, 572 (E.D.Mich.1994). Accordingly, the court will confine its discussion to Fourteenth Amendment principles.

Recent Supreme Court jurisprudence has clarified that several bases for a Fourteenth Amendment challenge to a voting scheme exist. *Miller,* —— U.S. at ——, 115 S.Ct. at 2500 (1995) (Ginsburg, J., dissenting) (noting that the Fourteenth Amendment has been invoked to enforce the one-person-one-vote requirement, to prevent vote dilution, and to challenge racial gerrymandering). Based on the content of the complaint and subsequent memoranda submitted by plaintiffs, the court has serious reservations whether plaintiffs truly intended to bring a Fourteenth Amendment claim outside of the *Shaw* framework discussed above. Rather, it seems that plaintiffs have crafted their arguments to support a vote dilution claim under § 2 and a *Shaw* claim under the Equal Protection Clause.

■ However, the court notes that, tucked away in a footnote in their brief in opposition of summary judgment, plaintiffs set forth that "plaintiffs' vote dilution claim is separate and distinct" from their *Shaw* claim. (Pls.' Br.Opposing Summ.J., p. 20, unnumbered footnote.) Although all of plaintiffs' arguments are directed toward meeting the standard enunciated for a Shaw claim, the court will nonetheless consider that a vote dilution

claim under the Fourteenth Amendment is before it.[5]

The Supreme Court has recognized that legislative apportionments could violate the Fourteenth Amendment "if their purpose were to invidiously minimize or cancel out the voting potential of racial or ethnic minorities." *Mobile v. Bolden,* 446 U.S. 55, 66, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980). The Court further explained that "[t]o prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers. A plaintiff must prove that the disputed plan was conceived or operated as [a] purposeful devic[e] to further racial ... discrimination." *Id.* (citation and internal quotations omitted); *see also Davis v. Bandemer,* 478 U.S. 109, 127, 106 S.Ct. 2797, 2807–08, 92 L.Ed.2d 85 (1986) (requiring plaintiffs to prove both intentional discrimination and an actual discriminatory effect); *White v. Regester,* 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2334, 37 L.Ed.2d 314 (1973) (plaintiff's burden is to show curtailed ability to participate in political process); *Whitcomb v. Chavis,* 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971) (instructing that to prove invidious discrimination, plaintiff must show that they are afforded less of an opportunity to participate in the political processes). To constitute purposeful discrimination, plaintiff must show "more than intent as volition or intent as awareness of consequences." *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).[6]

Defendants offer considerable evidence that, while race was a factor in the decision-making process, it by no means rose to the level of purposeful discrimination against whites. For example, Gerald Cohen, the drafter of the 4–2–1 electoral scheme, explained that he created the plan in order to maintain the integrity of existing precincts and to avoid splintering the precinct lines. (Cohen Aff. ¶¶ 2–3.) In fact, when Cohen was asked to draft the redistricting proposal, he was not offered any direction about racial composition. (Prelim.Inj.Tr.26.) Cohen further intimated that the final product was essentially a necessary byproduct of merging two distinct school boards populated predominantly along racial lines. (*Id.* at 34.) Not surprisingly, when combining the two boards, a main goal was to ensure initial representation from both systems and to facilitate a smooth transition from the old dual system to the new unified one. (*Id.;* Cohen Aff. ¶¶ 2–4.)

In response, plaintiffs make several contentions ostensibly showing that the electoral structure was designed intentionally to disadvantage white voters. Among these arguments are the following: (1) that prior to the merger, the county school board was comprised of five members elected at-large; (2) the political leaders who supported the merger plan were black; (3) the remedial legislation passed by the North Carolina Legislature was sponsored by black legislatures; (4) racial composition was considered in the discussions about the electoral structure; and (5) the racial breakdown of each district was known before the plan was adopted. (Pls.' Br.Opposing Summ.J., pp. 14–17.) Plaintiffs also submit a proposed consent agreement that was apparently discussed at an earlier stage between several of the parties. However, pursuant to Fed. R.Evid. 408, this material cannot be considered for the purpose offered when reviewing a summary judgment motion. *See* Fed. R.Civ.P. 56(e); *see also United States v. OCCI Co.,* 758 F.2d 1160, 1165 n. 6 (7th Cir.1985) (explaining that evidence barred

---

5. Although not raised by defendants, borrowing from the *Shaw* analysis, it might seem reasonable that standing would be denied here as well. Nonetheless, even if it appears logically inconsistent to maintain different standing tests for similar claims under the Equal Protection Clause, the Supreme Court has clearly indicated that a Fourteenth Amendment vote dilution claim is "an analytically distinct claim." *Shaw v. Reno,* 509 U.S. at 652, 113 S.Ct. at 2830. Accordingly, this court will not import the standing rules created for a *Shaw* claim to a traditional vote dilution claim.

6. Unfortunately, there is limited recent discussion of vote dilution claims under the Fourteenth Amendment. Instead, it appears that most challenges to apportionment schemes are scrutinized under either § 2 of the Voting Rights Act or in the framework of a *Shaw* claim.

under Rule 408 cannot be used to support or oppose a summary judgment motion).

■ On its face, several of the purported smoking guns are immaterial. The race of a sponsor or supporter of a particular plan is irrelevant. Similarly, the prior composition is not informative in light of the curative legislation and the recognition that the new board structure emerged from a reconfiguration of two separate school boards into a single entity. With respect to the remaining contentions, plaintiffs' evidence does not reveal an intent to thwart the participation of white voters in the election process. While race was undoubtedly a factor in the decision-making calculus, it is well established that the Fourteenth Amendment does not create a per se rule against the consideration of race in districting or apportionment. *United Jewish Org. v. Carey*, 430 U.S. 144, 161, 97 S.Ct. 996, 1007–08, 51 L.Ed.2d 229 (1977). Extrapolating from this premise, mere knowledge of the racial breakdown similarly does not merit an inference of invidious discrimination or create a genuine issue of material fact.

■ Overall, plaintiffs have again failed to offer evidence sufficient to warrant a Fourteenth Amendment violation. At the core of their complaint, plaintiffs appear to be dissatisfied that white candidates were not elected in direct proportion to the racial population percentages. Yet, no such right exists nor does the fact that an election fails to yield such a result automatically indicate that invidious discrimination has occurred. *See White*, 412 U.S. at 765–66, 93 S.Ct. at 2339–40 (1973); *Whitcomb*, 403 U.S. at 149–155, 91 S.Ct. at 1872–75 (1971). Accordingly, this claim must fail.[7]

■ Finally, plaintiffs insist that the use of voting-age population rather than registered-voter population constitutes a constitutional transgression. However, unless the selected population base somehow yields unacceptable results, the court will not second-guess the measures employed to assist in redistricting. *Daly v. Hunt*, 93 F.3d 1212, 1224 (4th Cir.1996) (noting that courts should generally defer to the state's choice of appor-

tionment base whether it is total population or voting-age population). As such, the court finds that the use of voting-age population as a guidepost for the redistricting was not improper. *See DeWitt v. Wilson*, 856 F.Supp. 1409, 1415 (E.D.Cal.1994) (rejecting a claim that voter registration, not total population, was the appropriate measuring stick for a redistricting plan), *aff'd in part, appeal dismissed in part*, —— U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995).

### IV. Conclusion

Based on the above reasoning, defendants' motion for summary judgment is GRANTED. This case, therefore, is hereby DISMISSED.

---

7. Because the Privileges and Immunities claim and the Fifth Amendment claim are inapposite to the factual predicate of this case, the court finds these claims meritless and forgoes further discussion.